## Harrison v. Welsh.

*Equity—Findings of fact by chancellor—Evidence.*
1. The findings of fact by a chancellor will be sustained by the court *in banc* where they are supported by the preponderance of the evidence and to a great extent by the testimony of the plaintiff himself.

*Confidential relation—Evidence—Customer and broker—Investing broker.*
2. No relation of trust and confidence arises merely out of the relation of a customer and his investing broker, where the relationship between the customer and the broker is in fact that of vendor and vendee.
3. To establish a confidential relation between such parties there must be some domination by one over the mind of the other, or some subservience or dependence of the mind of the one on that of the other.

*Evidence—Letter books—Copies of letters—Letters—Marking.*
4. Letter books or copies of letters are inadmissible as *prima facie* evidence of the letters having been received by the sendee without some evidence indicating that the letters were deposited in the usual channels for transmission of mail.

*Evidence—Special knowledge—Duty to disclose.*
5. Where two persons who deal with each other have equal means of knowledge as to values, the one with special knowledge as to values is not bound to disclose it to the other.

Bill in equity. C. P. No. 5, Phila. Co., Dec. T., 1925, No. 4515.

William M. Harrison, plaintiff, filed this bill in equity against Francis Ralston Welsh, defendant, to compel him to account for profits claimed to have been wrongfully made by him in the sale to, purchase from, or exchange of securities with, the plaintiff. Plaintiff died March 4, 1927, and his executors were substituted. In the original bill it was averred by plaintiff that for thirty years the defendant had acted as his agent in the purchase, sale and exchange of bonds; that in their transactions plaintiff had "constantly relied upon defendant's advice as to the character of the securities and the advantage to him in disposing of certain securities and acquiring others; and in all matters of investment and reinvestment relied implicitly and exclusively upon defendant's advice;" that this agency involved "a confidential relationship in those matters relating to investments." Subsequently

Harrison v. Welsh.

plaintiff filed an amended bill in effect disavowing any relation of agency and basing his claim against the defendant upon an alleged relation of trust and confidence existing between them, averring that for a period of thirty years in their business relations defendant had "continuously acted as plaintiff's confidential adviser for the purchase, sale and exchange of bonds;" and the bill averred a breach by the defendant of this confidential relationship in not disclosing to plaintiff the prices at which he (Welsh)) had purchased the bonds sold to Harrison, and the market value of bonds entering into their dealings in exchange or otherwise. The bill prayed for discovery, for an accounting and for reimbursement of the plaintiff for the amount to which the defendant had illegally profited by reason of their business relations. Defendant filed a responsive answer denying any confidential relations between himself and the plaintiff in the above matters, and averring that he (defendant) was a dealer in bonds and securities; that the bonds sold to or delivered to the plaintiff in exchange were owned by defendant and that he (defendant) was in no sense a broker and had never received any commission or pay from the plaintiff (Harrison), and that the relations between the two men were solely those of vendor and vendee. Defendant asked that the bill be dismissed. At the hearing, plaintiff's counsel admitted there was no relation of agency between the parties, and that the right to an accounting turned upon the alleged relation of trust and confidence existing between them during the course of their dealings. The chancellor, Henry, P. J., of 52nd judicial district, specially presiding, found that the relationship between plaintiff and defendant was that of vendor and vendee; that there was "no such relation of trust and confidence as to indicate that the mind of Harrison was dominated by that of Welsh in matters of making investments, or that Harrison was subservient to or dependent upon Welsh." He also found that there had been no fraud or misrepresentation practiced by Welsh in his dealings with Harrison, and he further said, in his discussion of the subject, that "in all their dealings" there had been "nothing to indicate that the defendant was not a man of integrity or that he dealt in anything but high grade, or, at least, what might be termed a business man's class of investments, or that he was guilty of any fraud or misrepresentation with reference to his securities."

Plaintiff offered in evidence a copy of a letter of July 18, 1910, from Harrison to Welsh. This letter contained the declination of a business offer made by Welsh and the suggestion that their relations should remain as heretofore, "namely, that of Harrison as investor and Welsh as guide and advisor," and tended to sustain the contention of the existence of a confidential relationship between them. The copy of this letter was admitted in evidence after Harrison had testified that he had written and mailed it. He subsequently admitted that he had no personal knowledge of the mailing and its receipt was denied by Welsh. The chancellor sustained a motion to strike the letter from the record, saying in his adjudication:

"To sustain his contention the plaintiff placed considerable dependence upon a letter dated July 18, 1910, from Harrison to Welsh, which Welsh denied having received, but which was admitted in evidence after Harrison had testified that it was written by him and duly mailed. Subsequent testimony on the part of Harrison himself as well as his employees indicated that neither Harrison nor any one else had any recollection of the mailing or delivery of this letter. The practice in Harrison's office seems to have been to place letters upon a table or desk, where they were lifted by letter carriers. When they were not so taken by the carriers, they were deposited in one of

several mail-boxes in the vicinity, either by Mr. Frey, plaintiff's secretary, or by Huddat, the typewriter, who is now deceased. The evidence of the plaintiff's witnesses, however, indicates that letters from Harrison to Welsh were at times delivered personally by either Frey or Huddat. There was no evidence to the effect that this letter had been postage-stamped, or whether it was forwarded through the mails or delivered personally. So that there is no evidence to show a *prima facie* delivery of this letter to the defendant; and the motion of the defendant to strike out its admission must be allowed and the letter not considered as evidence. The rule in Pennsylvania is that a letter, properly addressed, with prepaid postage, deposited in a post-office or in a letter-box or given to a letter carrier, raises a presumption that it was received by the person to whom it was addressed: Pearce v. Langfit, 101 Pa. 507; Whitmore v. Insurance Co., 148 Pa. 405; Neubert v. Water Co., 211 Pa. 582. Some courts have held that this presumption may arise from the course of business or custom of the sender's office, or the contents of a merchant's letter book; but the courts of Pennsylvania have not yet so held, and we know of no court that has gone to the extent of holding that such presumption arises where the practice is to forward some mail through the regular postal channels and to deliver some by messenger; and there is no evidence indicating how the letter in question was sent, or that it was actually delivered."

The chancellor dismissed the bill and imposed the costs on the plaintiff. To this action exceptions were taken.

*Powell, Ludlow & Scheaffer,* for plaintiff.

*Bell, Trinkle & Bell,* for defendant.

HENRY, P. J., 52nd judicial district, specially presiding, April 12, 1928.— This case is now before the court for the consideration of fifty-nine exceptions filed to the findings of fact, conclusions of law and the decree *nisi* entered by the chancellor.

The plaintiff submits that these exceptions involve the following four questions: (1) Can the court reverse the findings of a chancellor? (2) Was there a confidential relationship between the parties? (3) What was the bearing upon this relationship of the admissibility of the letter of July 18, 1910? (4) Did Welsh, in connection with his business of buying and selling bonds for his own account, have any special learning or means of knowledge not available to Harrison?

In support of the first question, authorities are submitted to the effect that the court *in banc* and the appellate courts will reverse the findings of a chancellor where they are not supported by evidence or where they are clearly erroneous, citing, among others, Deaver v. Slane, 271 Pa. 317, and Crick v. Paull, 287 Pa. 431, 435. We are fully in accord with the law as laid down in these decisions and might add that not only the appellate courts and the court *in banc*, but the chancellor himself, should reverse findings where they are not supported by the evidence or where they are erroneously made. It may be added, the judges who sat as a court *in banc* at the argument upon these exceptions are in accord with the conclusions now reached.

Upon a careful review of the evidence with the argument of the plaintiff in mind, we are convinced that the findings are not only supported by evidence, but by a preponderance of the evidence, and to a great extent by the testimony of the plaintiff himself, and that the findings were not erroneously made. If we read the plaintiff's argument aright, then some stress is laid upon the fact that the plaintiff testified there was a confidential relationship

existing between himself and the defendant, that he relied upon the judgment and advice of the defendant, and that the defendant had knowledge of securities not possessed by or available to the plaintiff. It is true the plaintiff did make some such statements, but they were conclusions of fact which were for the court, and those conclusions were not sustained by the evidence in the case or by the testimony of the plaintiff, in that he testified, and with some degree of pride, that, although seeking advice, he exercised independent judgment in making investments and that he invested in securities against the express advice and reasoning of the defendant.

The second question involved in this argument is whether a confidential relationship existed between the plaintiff and defendant. There admittedly was no such relation of trust and confidence as arises out of the situation of lawyer and client, physician and patient, priest and parishioner, trustee and cestui que trust, among others; but the contention is that such relation arose out of the transactions and business relations between the plaintiff and defendant. Exception is taken to the court's findings and reasons therefor as being erroneous, because of the consideration of the length or period over which the dealings between the parties extended, the magnitude of these dealings and the comparatively infrequent advice or suggestion of any trust or confidence upon the part of the plaintiff. It is true that in reaching the conclusions on the facts the court did consider the whole period of time, covering about thirty years, and did not restrict the consideration of this question to a period of ten years or more over which certain letters passed between the parties or written requests were made by the plaintiff upon the defendant relating to investments and to advice given by the defendant to the plaintiff with reference to investments, much of which had no relation to the business of the defendant or the securities he sold or offered to sell to the plaintiff. The chancellor considered all the evidence bearing upon this question up to the time of the severance of business relations. Nor do we think the chancellor misconceived what was essential to establish the relation of trust and confidence when the seventh finding of fact was based upon a conclusion that no such relation of trust and confidence had been established as to indicate that the mind of Harrison was dominated by that of Welsh in the making of investments or that Harrison was subservient to or dependent upon Welsh.

In Frey's Estate, 223 Pa. 61, 64, it was held that "if the vendor was thoroughly acquainted with every fact which it was necessary for him to know; if he was twenty-one years of age and of sound mind; if there were no circumstances which gave the vendee an improper control over him amounting to mental imprisonment; if the vendor behaved honestly and the vendee was able to go and look with a free mind, with his eyes open, then the one had a right to sell and the other to buy on any terms they saw proper to agree upon."

In Leedom et al. v. Palmer et ux., 274 Pa. 22, it was held that the confidential relation "appears when the circumstances make it certain that the parties do not deal on equal terms, but, on the one side, from overmastering influence, or, on the other, weakness, dependence or trust justifiably reposed; in both an unfair advantage is possible;" and, again, on page 26 of the same opinion, "where undue influence and incompetency do not appear and the relation between the parties is not one ordinarily known as confidential in law, the evidence to sustain a confidential relation must be certain; it cannot arise from suspicion or from infrequent or unrelated acts."

We adhere to the conclusion reached in the seventh finding of fact, which is, in effect, that where there is no such situation recognized as creates a confidential relation in law, there must be some evidence indicating that there was

some domination by one over the mind of the other or some subservience or dependence of the mind of one on that of the other.

The third question is whether the letter of July 18, 1910, was properly rejected. The conclusion of the chancellor was that letter books or copies of letters are inadmissible in evidence as *prima facie* evidence of their being received by the sendee, without some evidence indicating that they were deposited in the usual channels for transmission by mail. The authorities cited in the former opinion of the court amply sustain the position and conclusion of the chancellor. The plaintiff places some reliance upon Huckestein *v.* Kelly & Jones Co., 152 Pa. 631, in which there was evidence to prove that the letter was mailed or sent, and this decision must be taken in connection with that in the same case of Huckestein *v.* Kelly & Jones Co., 139 Pa. 201, in which one of the grounds of reversal was the admission of copies of letters without proof that the originals were received by the parties to whom they were addressed, or that they had been mailed to them; the court held that "they were not competent evidence for any purpose and their admission was error."

Assuming, however, that letter books, or the custom of an office with reference to the sending out of mail, can be offered as *prima facie* evidence of such mail being received by the party to whom [it is] addressed, the evidence of the plaintiff fails, in that it is not established that there was an invariable custom with reference to the mail from the plaintiff's office. The evidence in this respect was that some mail, not all, was deposited on a table where some of it, not all, was taken by the mail carriers, and what was not so taken was deposited in the mail-boxes by either the plaintiff's secretary, Frey, or by the typewriter, Huddat, who is now dead. Some letters addressed to the defendant were not sent through the mail, but were delivered personally either by Frey, the secretary, or by Huddat, the typewriter, who was not living at the time of the trial. There was no evidence showing, or tending to show, how this letter of July 18, 1910, was sent, whether by messenger or through the mails, or that it was ever received by the defendant. On the other hand, the defendant testified that he never received it. We think the letter was inadmissible and properly rejected.

The fourth question involved in the argument is whether Welsh, in connection with his business of buying and selling bonds for his own account, had any special learning or means of knowledge not available to Harrison. The evidence disclosed that the defendant, Welsh, made a special study of the securities which he offered for sale and suggested to the plaintiff such special study and the knowledge derived therefrom. He testified as to his examination of the records of mortgages as bearing upon the conditions attached to securities he sold and as bearing upon their security or value; but there was nothing in the case to indicate that the means of knowledge or the sources of information from which the defendant acquired this knowledge were not as open to Harrison as to Welsh; and this being so, the one with such special knowledge as affecting values was not bound to disclose it to the other, who had neglected to avail himself of the means of information which were open to him.

All of the questions involved in the argument upon these exceptions must be determined adversely to the plaintiff and the exceptions must be overruled and a final decree entered.

### Final decree.

And now, to wit, April 12, 1928, upon consideration of the foregoing case, it is ordered, adjudged and decreed as follows:

Harrison v. Welsh.

1. All the exceptions of the plaintiff taken to the findings of fact and conclusions of law and to the decree *nisi* entered by the chancellor, being numbered from 1 to 59, both inclusive, are overruled and dismissed.

2. The bill of the plaintiff is hereby dismissed.

3. The costs of this proceeding are directed to be paid by the plaintiff.

4. The prothonotary is directed to notify the parties, or their counsel of record, of the entry of this final decree.